**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **ARIELLE TILLMAN,**<br>   **Plaintiff** | **CIVIL ACTION** |
| **VERSUS** | **NO. 20-1656** |
| **HAMMOND'S TRANSPORTATION, LLC,**<br>   **Defendant** | **SECTION: "E" (1)** |

**ORDER AND REASONS**

Before the Court is Plaintiff Arielle Tillman's Motion for Default Judgment against Defendant Hammond's Transportation, LLC ("Hammond's").[1]

**BACKGROUND**

On September 27, 2021, the Court held a hearing on Plaintiff's Motion for Default Judgment.[2] Plaintiff testified at the hearing.

At the hearing, Plaintiff testified she began working as a bus driver for Hammond's in the fall of 2014. Plaintiff testified she drove for Hammond's for one school year, and, in the summer of 2015, Hammond's informed Plaintiff she would be driving for its subcontractor, Safe Turn, LLC ("Safe Turn"). For the following two school years, Plaintiff reported to Hammond's field supervisors. Plaintiff testified that, beginning in or about September 2015, Malcolm Wilson began to sexually harass Plaintiff. Plaintiff testified she reported the situation to Mark Hammond, the owner of Hammond's, but he did not address the situation. Plaintiff testified she left Safe Turn because of this sexual

---

[1] R. Doc. 31.
[2] R. Docs. 32 and 33.

1

harassment. Plaintiff also testified she filed a sexual harassment lawsuit against Hammond's and Safe Turn, and that she settled the lawsuit with Safe Turn.[3]

Plaintiff testified she began driving a school bus for Leadam Transportation, L.L.C. ("Leadam"), in December 2018, which is a subcontractor to Hammond's. Plaintiff testified she provided a background check and drug test, at her own expense, to Leadam, and that the information was sent directly to Hammond's. Plaintiff further testified that as a driver for Leadam, she was required to attend Hammond's safety meetings. Plaintiff testified that while she was attending a Hammond's safety meeting in January of 2019, she was recognized by Mark Hammond. Plaintiff further testified that later that evening, Leadam's owner, Lee Adams, informed Plaintiff he had to terminate her for non-disclosable reasons. Plaintiff testified she and Mr. Adams called Hammond's together, and Plaintiff was informed she was hired on a temporary basis and that her date had expired. Plaintiff also testified she and Mr. Adams believed she was not hired on a temporary basis. Plaintiff further testified Hammond's informed her there was a "non-disclosure" preventing any further explanation. Plaintiff was then terminated.

Plaintiff initiated this Title VII employment retaliation action by filing her complaint on June 9, 2020.[4] Plaintiff alleges Hammond's caused the termination of her employment as a bus driver for Leadam in retaliation for Plaintiff's previous Title VII protected activity against Hammond's. She alleges that Hammond's is liable to her as her prior employer and as a joint employer with Leadam.

---

[3] Plaintiff testified she did not settle with Hammond's. The record in that action, styled *Tillman v. Hammond's Transp., LLC and Safe Turn Transp., LLC*, Civ. No. 17-cv-12203 (E.D. La.), reflects that all of Plaintiffs claims against all Defendants were voluntarily dismissed. *See id* at R. Docs. 5, 6, and 7.
[4] R. Doc. 1.

On July 27, 2020, Hammond's filed a waiver of the service of summons on Hammond's into the record.[5] On August 24, 2020, Hammond's filed an Ex Parte/Consent Motion for Extension of Time to Answer, which the Court granted, extending the deadline to September 14, 2020.[6] On September 14, 2020, Hammond's filed a Rule 12(b)(6) Motion to Dismiss.[7] On May 3, 2021, the Court denied Hammond's motion to dismiss, finding that

> Plaintiff has alleged she participated in a protected activity by filing the 2017 Action against Hammond's and that Hammond's, either as her former employer or her joint employer, took an adverse employment action against her. Plaintiff has alleged a causal connection exists between the protected activity and the adverse action. At this stage of the proceedings, Plaintiff need only plausibly allege facts going to the ultimate elements of her claim to survive a motion to dismiss.[8]

Hammond's participated in a Preliminary Conference on January 14, 2021.[9] Hammond's filed a corporate disclosure statement on January 15, 2021.[10] Hammond's appeared at status conferences on June 3,[11] June 22,[12] and July 23, 2021.[13] At the conferences, the Court and the parties discussed Hammond's failure to file an answer.

Plaintiff filed a Motion for Entry of Default on August 10, 2021.[14] The Clerk of Court entered a default against Hammond's on August 12, 2021.[15] On August 31, 2021, Plaintiff filed a Motion for Default Judgment, and served a copy of the motion on Hammond's.[16]

---

[5] R. Doc. 3.
[6] R. Docs. 4 and 5.
[7] R. Doc. 6.
[8] R. Doc. 21.
[9] R. Docs. 17 and 18.
[10] R. Doc. 19.
[11] R. Doc. 22.
[12] R. Doc. 24.
[13] R. Doc. 27.
[14] R. Doc. 28.
[15] R. Doc. 30.
[16] R. Doc. 31.

On September 9, 2021, the Court entered an order setting a hearing for September 27, 2021 for Plaintiff to establish the truth of her allegations by evidence and to prove the amount of damages, if any, to which Plaintiff is entitled.[17] On September 27, 2021 the default judgment hearing was held. Hammond's counsel attended the hearing. Following the hearing, the Court ordered Plaintiff to provide an affidavit in support of damages and an affidavit in support of attorneys' fees.[18] On October 4, 2021 Plaintiff filed an affidavit in support of damages[19] and an affidavit in support of attorneys' fees.[20] On October 29, 2021 Plaintiff filed a supplemental affidavit in support of attorneys' fees.[21]

## **LEGAL STANDARD**

When a plaintiff's claim is not for a sum certain and the Defendant has failed to plead or otherwise defend, the plaintiff must apply to the court for a default judgment.[22] "A defendant's default does not in itself warrant the court in entering a default judgment. There must be a sufficient basis in the pleadings for the judgment entered."[23] "A default judgment may be lawfully entered only 'according to what is proper to be decreed upon the statements of the bill, assumed to be true.'"[24] The defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law.[25]

Under Federal Rule of Civil Procedure 55 (b)(2), if the plaintiff's claim is for a sum which is not certain,

---

[17] R. Doc. 32.
[18] R. Doc. 34.
[19] R. Doc. 35.
[20] R. Doc. 36.
[21] *Id.*
[22] Fed. R. Civ. P. 55(a).
[23] *Nishimatsu Const. Co., Ltd. v. Houston Nat. Bank*, 515 F.2d 1200 (5th Cir. 1975).
[24] *Id.* (quoting Thomson v. Wooster, 1884, 114 U.S. 104, 113 (1984)).
[25] *Nishimatsu Const. Co., Ltd.*, 515 F.2d 1200.

the [plaintiff] must apply to the court for a default judgment. A default judgment may be entered against a minor or incompetent person only if represented by a general guardian, conservator, or other like fiduciary who has appeared. If the party against whom a default judgment is sought has appeared personally or by a representative, that party or its representative must be served with written notice of the application at least 7 days before the hearing. The court may conduct hearings or make referrals—preserving any federal statutory right to a jury trial—when, to enter or effectuate judgment, it needs to:

> (A) conduct an accounting;

> (B) determine the amount of damages;

> (C) establish the truth of any allegation by evidence; or

> (D) investigate any other matter.

## **FINDINGS**

At the hearing, Plaintiff testified credibly that she had formerly been employed by Hammond's and that she had previously sued Hammond's for alleged violation of Title VII. Plaintiff also testified that in January 2019, she was working for Leadam without incident or complaint. Plaintiff testified she submitted her background check and drug test through Leadam, and that the information was sent directly to, and approved by, Hammond's. Plaintiff testified she was required to attend a Hammond's driver safety meeting as a driver for Leadam in January 2019, and that she was recognized by Mark Hammond at the safety meeting. Later that evening, Plaintiff testified she was advised by Leadam that she was being terminated at the demand of Hammond's. Plaintiff testified she was informed she was being terminated because she was only a temporary hire. Plaintiff testified she and Leadam's owner believed she had *not* been hired as a temporary hire, and that there was no prior discussion of temporary hire status with Hammond's.

5

Ultimately, Hammond's insisted that Plaintiff be terminated and Leadam, as subcontractor, acquiesced.

In her complaint, Plaintiff alleges she suffered "lost wages and benefits," and seeks to recover "compensation for past and future pecuniary losses resulting from Defendant's unlawful employment practices," namely backpay and front pay.[26] An award of front pay is intended to compensate the plaintiff for wages and benefits she would have received from her employer in the future if not for the unlawful employment discrimination.[27] Front pay is appropriate when reinstatement is not feasible. An award of back pay is recoverable "if the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice."[28] A plaintiff must make a reasonable effort to secure other employment to be entitled to back pay, and, in calculating the back pay award, "[i]nterim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable."[29] The number of months included in the back pay period is based upon the number of months since the plaintiff was fired or not rehired.[30] Plaintiff's pleadings, affidavits, and testimony suffice to establish that Hammond's engaged in unlawful and intentional employment retaliation by causing the termination Plaintiff's employment. As a result, Plaintiff is entitled to back pay. In addition, Plaintiff is entitled to front pay.[31]

---

[26] R. Doc. 1 at pp. 9, 11.

[27] *Tyler v. Union Oil Co. of California*, 304 F.3d 379, 402 (5th Cir. 2002).

[28] 42 U.S.C. 2000e–5(g).

[29] *Id.*

[30] *See, e.g., Vaughn v. Sabine Cty.*, 104 F. App'x 980, 985 (5th Cir. 2004) (using a 25-month back pay period because "[a]t the time of trial, 25 months had passed since Vaughn and Holman were not rehired.").

[31] Based on Plaintiff's testimony regarding her history with Hammond's, the Court concludes reinstatement of Plaintiff's prior employment is not feasible.

Plaintiff seeks backpay for three periods: January to May 2019;[32] August 2019 to March 15, 2020;[33] and August 2021 to October 2021.[34] At the hearing, Plaintiff testified to the wages she was earning as a bus driver for Leadam. Plaintiff testified while working for Leadam she was driving four days per week, making $100 per day, plus extra pay for field trips, sporting events, and the like. In her sworn affidavit of damages, Plaintiff attests she was making $2120 per month while working for Leadam.[35] Plaintiff also testified regarding various jobs she has worked since being fired from her bus driving job at Leadam, and her earnings in those jobs. Plaintiff testified she is currently employed at Loving Hearts, but she makes less in her current position than she did working as a bus driver. Plaintiff's affidavit reflects the earnings she was making at other jobs during the periods for which she seeks back pay.[36] Plaintiff's affidavit includes the amounts of back pay awards she seeks for the three periods, using the $2120 per month figure offset by Plaintiff's actual earnings during such periods.[37] Plaintiff also seeks front pay for two periods: October 2021 to May 20, 2022; and August 2022 to May 2023.[38] Plaintiff's affidavit includes a calculation for the proposed front pay award based on the October 2021 to May 2022 period and the August 2022 to May 2023 period.[39] Plaintiff's proposed front pay award also uses the $2120 per month figure and uses an offsetting figure based upon Plaintiff's earnings at her current job.[40] The calculations of back and front pay

---

[32] This period represents the remainder of the 2018-2019 school year, during which Plaintiff was terminated. *See* R.Doc. 35.
[33] This period represents the 2019-2020 school year, but ends in mid-March 2020 when busses stopped operating due to school closures during the beginning of the COVID-19 pandemic. *See id.*
[34] This period represents the beginning of the 2021 school year to the present date. *See id.*.
[35] R. Doc. 35.
[36] *See* R. Doc. 35.
[37] *See id.*
[38] *See id.*
[39] *See id.*
[40] R. Doc. 35.

damages contained in Plaintiff's post-hearing affidavit[41] are fair and supported by the evidence.

Plaintiff also seeks to recover compensatory damages related to nonpecuniary losses "including but not limited to emotional and mental anguish, pain and suffering, loss of enjoyment of life, and devastation."[42] Compensatory damages can be awarded to recompense "the intangible injuries of emotional harm such as emotional pain, suffering, inconvenience,  mental anguish, and loss of enjoyment of life. A plaintiff's testimony may be sufficient to establish emotional distress."[43] A plaintiff's testimony may be sufficient to justify an award of compensatory damages.[44]

At the hearing, Plaintiff testified she had been going to nursing school while driving for Leadam, and that, after she was terminated, she had difficulty finding employment with comparable pay that fit into her school schedule. Plaintiff testified that to pay her living expenses, she eventually had to take a job working nights and failed her nursing school course she was working at night and did not have time to study. Specifically, Plaintiff testified she had to find another job which caused strain on her school schedule and that she ended up failing school because she was working so much. Plaintiff testified that, as a result, she had to switch from the registered nurse program to the licensed practical nurse program. Plaintiff testified that she would prefer to drive for Leadam over working at her current job because the bus driving job allowed her to have more free time to study, do extra homework and labs, and focus better on school. Plaintiff testified she

---

[41] *Id.*
[42] R. Doc. 1.
[43] EEOC Enforcement Guidance on Compensatory and Punitive Damages Available under § 102 of the Civil Rights Act of 1991, No. 915.002 (July 14, 1992).
[44] *Price v. City of Charlotte, N.C.,* 93 F.3d1241 (4th Cir. 1996).

8

suffered inconvenience and emotional distress as a result of her termination. Specifically, Plaintiff testified that she was "hurt and depressed" when she was terminated, and that it interfered with her school and school had been her main focus. Plaintiff testified she "lost interest in anything. [She] didn't want to do anything no more. [She] wasn't interesting in doing nothing." Plaintiff testified she sought medical treatment with a therapist and a psychiatrist. Plaintiff testified her primary care doctor referred her to a psychiatrist because Plaintiff was experienced suicidal thoughts and severe depression. Plaintiff testified she began seeing the therapist in May of 2020 and continues to see him.

Plaintiff also seeks an award of attorneys' fees. "In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorneys' fee (including expert fees) as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person."[45] The Supreme Court has explained that "when a plaintiff secures an enforceable judgment on the merits or a court-ordered consent decree, that plaintiff is the prevailing party because he has received a judicially sanctioned change in the legal relationship of the parties."[46] In this case, the Court concludes there is a sufficient basis in the pleadings for default judgment to be entered against Hammond's and in favor of Plaintiff. As a result, Plaintiff is the prevailing party, and the Court will award attorneys' fees and costs to Plaintiff.

Courts in the Fifth Circuit employ a two-step method for calculating attorneys' fees, to wit: First the court calculates the "lodestar" which is equal to the number of hours

---

[45] 42 U.S.C. § 2000e-5(k).
[46] *CRST Van Expedited, Inc. v. E.E.O.C.*, 578 U.S. 419, 422 (2016) (quoting *Buckhannon Board & Care Home, Inc. v. West Virginia Dept. of Health and Human Resources*, 532 U.S. 598, 602–603, and n. 4 (2001)) (internal quotations omitted).

reasonably expended multiplied by the prevailing hourly rate in the community for similar work.[47] The court should exclude all time that is excessive, duplicative, or inadequately documented.[48] In addition, the rate must be calculated "at the 'prevailing market rates in the relevant community for similar services by attorneys of reasonably comparable skills, experience, and reputation.'"[49] Once the lodestar amount is calculated, the court can adjust it based on the twelve factors set forth in *Johnson v. Georgia Highway Express, Inc.*[50]

The Supreme Court has noted that a "party seeking an award of fees should submit evidence supporting the hours and the rates claimed."[51] Satisfactory evidence of the reasonableness of the rate "necessarily includes an affidavit of the attorney performing the work and information of rates actually billed and paid in similar lawsuits."[52] If the hourly rate is not opposed, it is prima facie reasonable.[53] The party seeking reimbursement of attorneys' fees "has the burden of establishing the number of attorney hours expended, and can meet that burden only by presenting evidence that is adequate

---

[47] *Jimenez v. Wood Cty., Tex.*, 621 F.3d 372, 379–80 (5th Cir. 2010), *on reh'g en banc*, 660 F.3d 841 (5th Cir. 2011).

[48] *Watkins v. Fordice*, 7 F.3d 453, 457 (5th Cir.1993).

[49] *Int'l Transp. Workers Fed'n v. Mi-Das Line, SA,* No. 13–00454, 2013 WL 5329873, at *3 (E.D. La. Sept. 20, 2013) (*quoting Blum v. Stenson,* 465 U.S. 886, 895 (1984)).

[50] 488 F.2d 714, 717–19 (5th Cir.1974). The Johnson factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *See Lalla v. City of New Orleans*, 161 F. Supp. 2d 686, 697 (E.D. La. 2001).

[51] *Hensley*, 461 U.S. at 434.

[52] *Shaw v. Ciox Health LLC*, No. CV 19-14778, 2021 WL 928032, at *2 (E.D. La. Mar. 11, 2021) (*quoting Blum v. Stenson,* 465 U.S. 886, 895 (1984)).

[53] *Shaw*, 2021 WL 928032, at *2 (*quoting La. Power & Light Co. v. Kellstrom,* 50 F.3d 319, 328 (5th Cir. 1995) *and Powell v. Comm'r*, 891 F.2d 1167, 1173 (5th Cir. 1990)).

for the court to determine what hours should be included in the reimbursement."[54] Normally, applicants are required to produce contemporaneous billing records or some similar form of sufficient documents, so the district court can examine the application for compensable and non-compensable hours.[55] Determinations of hours and rates are questions of fact.[56]

In this case, Plaintiff supports her request for attorneys' fees with a post-hearing affidavit, a copy of her lawyer's resume, and a printout of the activity detail report prepared with her lawyer's practice management software, documenting the hours he has worked on Plaintiff's case.[57] Plaintiff also filed a supplemental affidavit of attorneys' fees with an attached spreadsheet, which was created using data from the timekeeping system, showing the hours Plaintiff's counsel marked as non-billable.[58] Plaintiff seeks attorneys' fees for 70.1 hours of work at a rate of $350 per hour, with no upward or downward adjustment.[59] According to the activity detail reports attached to Plaintiff's affidavit of attorneys' fees, Plaintiff's counsel spent a total of 107.7 hours working on Plaintiff's case.[60] Furthermore, the spreadsheet attached to the supplemental affidavit reflects that Plaintiff's counsel marked 37.6 hours as non-billable.[61] In the supplemental affidavit, Plaintiff's counsel states that all time entries "are personally reviewed by me to exclude de minimis or duplicative entries and purely administrative actions, to ensure that the

---

[54] *Louisiana Power & Light Co. v. Kellstrom*, 50 F.3d 319, 324 (5th Cir. 1995).
[55] *Id.*
[56] *See Bode v. United States*, 919 F.2d 1044, 1047 (5th Cir.1990)
[57] *See* R. Docs. 36, 36-1, and 36-2.
[58] R. Doc. 37.
[59] *Id.*
[60] *See* R. Doc. 36-1.
[61] *See* R. Docs. 37, 37-1, and 37-2.

activity was properly billable, and to ensure that the time logged is reasonable."[62] Plaintiff's counsel further states he marked the 37.6 Hours as non-billable "in order to ensure billing discretion."[63]

The Court has reviewed the attorneys' fee affidavits and attachments. The Court finds the time expended by Plaintiff's counsel working on her case is adequately documented by contemporaneous billing records. Furthermore, given that Plaintiff's counsel has already marked approximately 35% of his time as non-billable, the Court finds that Plaintiff's counsel has demonstrated adequate billing discretion. As a result, the Court accepts 70.1 hours as a reasonable amount of compensable time.

The next question is whether $350 per hour constitutes a reasonable fee in the greater New Orleans community. Plaintiff's counsel, Alan Kansas, has more than 27 years of experience in litigation, primarily in employment-related matters.[64] In his affidavit, Mr. Kansas states, for non-contingency fee cases, he customarily charges individual and corporate clients an hourly rate of $250 to $300 per hour in matters similar to this one.[65] The unopposed affidavit establishes that the reasonable hourly rate in the New Orleans area for a lawyer with Mr. Kansas level of experience is between $250 - $300 per hour for similar cases. Courts have awarded attorneys' fees based on hourly rates higher than the attorney's standard hourly billing rates when the lawyer achieved successful results and worked on a contingency fee basis.[66] Because Mr. Kansas has successfully represented Plaintiff on a contingency fee basis in this case, an hourly rate in excess of his standard

---

[62] R. Doc. 37 at p. 1.
[63] R. Doc. 36 at p. 4.
[64] R. Docs. 36 and 36-2.
[65] R. Doc. 36 at p. 4.
[66] *See, e.g., Dumas v. Tyson Foods, Inc.,* 139 F.Supp.2d 1243, 1246 (N.D. Ala. 2001); *Jordan v. CCH*, 230 F.Supp.2d 603, 608 (E.D. Penn. 2002).

hourly rate is appropriate. As a result, $350 per hour rate—which is unopposed—is a reasonable rate in this case. The lodestar calculation in this case is 70.1 hours of work at $350 per hour.

Although a court may increase or decrease the lodestar based upon an application of the twelve *Johnson* factors, "[t]here is a strong presumption that the lodestar is the reasonable fee, and the fee applicant bears the burden of showing that such an adjustment is necessary to the determination of a reasonable fee."[67] The Court will not adjust the lodestar calculation based upon application of the *Johnson* factors for two reasons. First, Plaintiff seeks an award equal to the lodestar and does not request any enhancement based upon application of the *Johnson* factors. Second, the Court finds the applicable *Johnson* factors are already reflected in the lodestar amount and the factors should not be used to otherwise adjust the lodestar. For example, the first, second, and tenth factors might apply in this case because, generally, employment discrimination cases are difficult and undesirable cases by their nature,[68] and, the difficulty of this specific case his case was increased by the joint employer/former employer issue. However, plaintiff's counsel already has been allowed to charge 70.1 hours for his work on a case resolved by default judgment, and "the novelty and complexity of the issues [are] fully reflected in the number of billable hours recorded by counsel."[69] Similarly, the success achieved by the lawyer is usually adequately reflected in the reasonable hourly rate, and in this case, plaintiff's counsel's success is fully compensated by the hourly rate allowed.[70] Finally, plaintiff's counsel took this case on a contingency fee basis, and the Court took the contingent nature

---

[67] *Walker v. U.S. Dep't of Hous. & Urb. Dev.*, 99 F.3d 761, 771 (5th Cir. 1996).
[68] *Thomas v. Cooper Industries, Inc.* 640 F.Supp 1374, 1378 (W.D. N.C. 1986).
[69] *Blum v. Stenson*, 465 U.S. 886, 899 (1984).
[70] *Lalla v. City of New Orleans*, 161 F. Supp. 2d 686, 698 (E.D. La. 2001)

of the fee into account in calculating the lodestar. The Fifth Circuit has held that "[t]he lodestar may not be adjusted due to a Johnson factor, however, if the creation of the lodestar amount already took that factor into account; to do so would be impermissible double counting."[71] As a result, the Court concludes the *Johnson* factors do not warrant enhancement or reduction of the lodestar amount.

The Court has reviewed the attorneys' fee request detailed in the affidavit and supplemental affidavit of Plaintiff's counsel and has considered the relevant legal standards. Based upon the facts detailed in the affidavit and the record in the case, the Court finds that the attorneys' fee award requested is reasonable under the applicable legal standards.[72]

In the attorneys' fee affidavit, Plaintiff's counsel attests that the filing fee in this case was $400, and Plaintiff seeks to recover $400 in court costs.[73] The Court will award Plaintiff $400 in court costs.

## **CONCLUSION**

Upon considering the record, including the well pleaded allegations of Plaintiff's Original Complaint, the testimony of Plaintiff at the hearing on the Motion for Default, the affidavit of Plaintiff regarding damages, and the affidavits of plaintiff's counsel regarding attorneys' fees, the Court is of the opinion that Defendant Plaintiff's Motion for Default should be Granted.

Accordingly;

---

[71] *Saizan v. Delta Concrete Prod. Co.*, 448 F.3d 795, 800 (5th Cir. 2006).
[72] *See Jimenez v. Wood Cty.* 621 F.3d 372, 379 (5th Cir.2010), *on reh'g en banc*, 660 F.3d 841 (5th Cir.2011) *(citing Johnson v. Georgia Highway Express. Inc.*, 488 F.2d 714, 717-79 (5th Cir 1974)).
[73] R Doc. 36 at p. 5.

**IT IS HEREBY ORDERED** that Plaintiff Arielle Tillman's motion for default judgment[74] is **GRANTED**.

New Orleans, Louisiana, this 2nd day of November, 2021.

_____

**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[74] R. Doc. 31.